IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHARLES WILLIAM BRACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:15-cv-234-WKW |
| | ) | |
| JEFFERSON S. DUNN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff Charles William Bracy ("Plaintiff") is a former[1] inmate of the Alabama Department of Corrections ("ADOC"). He brings this action pursuant to 42 U.S.C. § 1983, challenging his placement in segregation and the conditions of his confinement while he was an inmate at Kilby Correctional Facility ("Kilby") in Mt. Meigs, Alabama. Doc. 1 at 2. Plaintiff's allegations include claims that he suffered violations of the Due Process Clause, Equal Protection Clause, and Eighth Amendment.[2] Plaintiff seeks declaratory and injunctive relief as well as damages. Docs. 1 at 5, 20-1, 21, 60, 61, 86. Plaintiff names as defendants Jefferson S. Dunn, Cassandra Conway, Kathy Holt, Phyllis Billups, Leon Bolling, Timothy Logan, John Richardson, Jeffery Williams, Grantt Culliver, and Terrance G. McDonnell[3] ("Defendants"). Plaintiff sues Defendants in their individual and official capacities. Doc. 33 at 2.

---

[1] Plaintiff informed the court of his new address that is not in the Department of Corrections. Doc. 208.
[2] The court denied Plaintiff's attempts to add claims, and it denied his request for preliminary injunctive relief. Docs. 41, 202.
[3] Terry McDonnell was substituted as a defendant for Steve Brown. Docs. 108, 109.

Pursuant to the orders of this court, Defendants filed answers, special reports, supplemental special reports, and evidentiary materials addressing the claims for relief raised in the complaint. Docs. 27, 35, 42, 45, 51, 69, 82, 85, 88, 99, 100, 102, 128, 135, 139, 140, 147, 161, 162, 171, 172, 174, 194, 195, 207. In their various reports, Defendants assert that Plaintiff fails to state a claim for relief, respondeat superior is not a basis for relief, there is no merit to Plaintiff's claims, they are entitled to Eleventh Amendment immunity and qualified immunity, Plaintiff cannot recover damages for mental or emotional injury because he does not allege a physical injury as required by 42 U.S.C. § 1997e(e), and Plaintiff did not properly exhaust his available administrative remedies before filing suit as required by 42 U.S.C. § 1997e(a).

The court directed Plaintiff to respond to Defendants' reports. Docs. 52, 196. The court advised Plaintiff it may, in the future, treat Defendants' report and Plaintiff's response as a dispositive motion and response. Doc. 52 at 2. The court advised Plaintiff that his response should be supported by affidavits or statements made under penalty of perjury or appropriate other evidentiary materials, and it advised him of the proper manner in which to respond to the reports. *Id.* at 2-3. Plaintiff responded. Docs. 33, 53, 81, 167, 201, 204.

This case is now pending before the court on Defendants' motion to dismiss based on lack of exhaustion under 42 U.S.C. § 1997e(a), and Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. Upon consideration of the motions, Plaintiff's responses, and the evidentiary materials filed in support of and in opposition to the motions, the court concludes that Defendants' motion to dismiss is due to be denied, and Defendants' motion for summary judgment is due to be granted in part and denied in part.

2

## II. 42 U.S.C. § 1997e(a)

Defendants argue Plaintiff's claims are due to be dismissed pursuant to the exhaustion requirement of the Prison Ligation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Doc. 27 at 16. Under § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The exhaustion requirement is an affirmative defense; it is not jurisdictional or a pleading requirement. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Woodford v. Ngo*, 548 U.S. 81, 101 (2006) ("the PLRA exhaustion requirement is not jurisdictional"); *Bryant v. Rich*, 530 F.3d 1368, 1374-75 & n.10 (11th Cir. 2008). If the defense is raised in a motion for summary judgment, it must be treated as a motion to dismiss under Federal Rule of Civil Procedure 12. *Bryant*, 530 F.3d at 1374-75. The court conducts a two-step inquiry in applying § 1997e(a). *See Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008). First, the court considers the parties' versions of the facts, and if they conflict, takes the plaintiff's version as true. *Id.* at 1082. If, based on the plaintiff's version, the claim is unexhausted, the court must dismiss the claim. *See id.* Second, if the case cannot be dismissed based on plaintiff's version and there are factual disputes, "the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. The defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." *Id.* (citations omitted).

Plaintiff states there is no grievance or appeal procedure he could use, therefore the PLRA does not apply to his case. Doc. 33 at 4. Defendants identify no administrative remedy that Plaintiff could exhaust. Consequently, the court concludes, Defendants have not met their burden to show

Plaintiff failed to exhaust his administrative remedies before filing suit regarding his claims. Defendants' motion to dismiss based on § 1997e(a) is therefore due to be denied.

### III. SUMMARY JUDGMENT STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations added). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits,

4

relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court considers facts pled in a plaintiff's sworn complaint when considering his opposition to summary judgment"). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Although factual inferences must be viewed in a

light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Plaintiff fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on all but one of his claims. *See Matsushita*, 475 U.S. at 587.

## IV. SUMMARY OF MATERIAL FACTS

Plaintiff entered Kilby in June 2013, to serve a twenty-year sentence for manufacture of a controlled substance and a fifteen-year sentence for manufacture of a controlled substance. Docs. 27-3 at 10, 139-1 at 12. He was transferred to the W.E. Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama, on October 7, 2015. Doc. 54. Plaintiff now resides at an address outside the custody of the ADOC. Doc. 208.

During the time relevant to the claims, Defendants were employed by the ADOC. Jefferson Dunn ("Dunn") became Commissioner of the ADOC on April 1, 2015, and before that he had no contact with the ADOC and appointed Deputy Commissioner of the ADOC on March 1, 2011. Doc. 27-1 at 1. Jeffery Williams ("Williams") was Deputy Commissioner of Governmental Relations with the ADOC. Doc. 69-2 at 1. Cassandra Conway ("Conway") has been the ADOC Director of Classification since June 1, 2013. Doc. 27-2 at 1. Grantt Culliver ("Culliver") was Associate Commissioner for Operations in the ADOC. Doc. 69-3. Terrance McDonnell ("McDonnell") was Associate Commissioner of Plans and Programs; in July 2014, the ADOC Classification Division was added to his responsibilities, and McDonnell retired in 2016. Doc. 135-1 at 1. Kathy Holt ("Holt") was Director of Central Records, and she retired on

December 31, 2012. Doc. 51-1. Phyllis Billups ("Billups") was Warden III at Kilby. Doc. 27-4. Leon Bolling ("Bolling") was Warden II at Kilby. Doc. 27-5. Timothy Logan ("Logan") was a Correctional Captain at Kilby. Doc. 27-6. John Richardson ("Richardson") was a Correctional Sergeant at Kilby. Doc. 27-7.

### A. Close Custody Segregation

While at Kilby in 2013, Plaintiff had a pending charge against him for drug trafficking and, because of his past criminal history, he faced a potential sentence of life without parole ("LWOP") on the pending charge. Docs. 27-2 at 1, 27-3 at 2.

In 2013, under ADOC Classification Manual § 5.2.2.4, inmates held on a detainer warrant for an offense which is likely to result in a sentence of death or LWOP were held in close custody until the resolution of the offense. Doc. 27-3 at 5, 8. "Close custody" was "the most restrictive custody level to which an inmate can be assigned . . . ." Doc. 27-3 at 6. Section 5.2.2.4 provided:

> **Detainers.** Inmates being held on a detainer warrant for a capital offense or an offense which is likely to result in LWOP will be held in Close custody until the resolution of the offense. This does not apply to LWOP sentences that have been reversed and remanded for retrial from the death sentence or out-of-state cases . . . . Placement into Close custody under these circumstances is a matter of internal security and does not imply any presumption of guilt.

Doc. 27-3 at 5 (dated October 2010).

At the same time, Classification Manual § 5.2.2.1 provided that inmates serving LWOP "will be observed in Close custody for at least a thirty (30) day period. . . ." Doc. 27-3 at 6. Standard Operating Procedure ("SOP") VI-7 Segregation Unit also contemplated LWOP inmates being placed in medium custody:

> [LWOP] inmates entering Kilby will be placed and housed in a single cell while at Kilby unless the Central Review Board has approved medium custody and the Warden of Kilby has personally authorized the LWOP inmate to be housed in a

> designated dormitory setting, unless assigned to a dormitory setting, LWOP
> inmates will be handled as Close or higher custody at all times.

Doc. 27-9 at 4 (dated May 27, 2015). Jimmy Thomas, Warden II at Kilby, who is not a defendant
in this case, said Plaintiff was subject to the above wording of SOP VI-7 Segregation Unit when
Plaintiff arrived at Kilby in 2013. Doc. 139-1 at 12. Inmates in close custody administrative
segregation have fewer privileges and are subject to greater security procedures than inmates in
medium custody administrative segregation. Doc. 128-1 at 8-11 (sealed).

On September 17, 2013, Plaintiff was notified that the reclassification team would meet
the next day to recommend that he be placed in close custody. Doc. 27-3 at 3. Plaintiff was present
at the hearing held on September 18, 2013, and he said he wished he had a lawyer. Doc. 27-3 at 4.
He was told he did not have a sentence yet of LWOP, just the possibility. *Id.* At the end of the
hearing, it was recommended that Plaintiff be placed in close custody/Level 5. Doc. 27-3 at 7.
Plaintiff's previous ADOC classification risk assessment was Level 1. Doc. 27-3 at 8. On
October 4, 2013, Mike Slatton, who is not a defendant in this case, approved the classification.
Docs. 27-2 at 2, 27-3 at 7-8. On June 22, 2015, Conway, the Director of Classification, stated that
Plaintiff was properly classified. Doc. 27-2 at 2.

As of October 4, 2013, Plaintiff was classified as a special needs inmate with mental health
code ("MH") MH 1, and he was taking psychological medications. Doc. 27-3 at 9. On
July 28, 2015, Dr. David Tytell, Chief Psychologist of the ADOC, met with Plaintiff to obtain his
mental health status pursuant to a court order. Doc. 35-2 at 3. Dr. Tytell stated on August 3, 2015,
that Plaintiff was being treated for bipolar disorder, that the diagnosis was accurate and fitting, and
that Plaintiff "appear[ed] to be relatively stable at this time with his mental health disorder." Doc.
35-2 at 2. Plaintiff has stated that solitary confinement damaged him, and he took "heav[]y anti-

psychotic medications to sleep or reduce anxiety." Doc. 33 at 18. Plaintiff's mental health was reviewed periodically during his time at Kilby, and his mental health treatment while in segregation is not the subject of this lawsuit.[4] Doc. 35-2 at 4-45.

On August 17, 2015, the classification manual was amended to remove the exception for inmates whose convictions were reversed and remanded or had out-of-state cases. It also was amended to allow inmates facing potential LWOP offenses to be placed in medium custody. Doc. 102-1 at 7-8 (dated Aug. 17, 2015).

On September 2, 2015, based on the change to the classification manual, Plaintiff was approved for medium custody and "transfer[red] to an approved SL V facility." Docs. 85-2 at 4, 85-3 at 2. On October 7, 2015, Plaintiff was transferred to Donaldson. Doc. 85-2 at 1. About a month later, the Classification Specialist recommended that Plaintiff remain in medium custody due to pending detainers for drug offenses. Doc. 85-2 at 2. Plaintiff states he was released into the general population at Donaldson. Doc. 163-5 at 2.

Dunn, who became the ADOC Commissioner on April 1, 2015, stated that he does not control the daily operation of Kilby; he does not know Plaintiff; he does not recall a complaint from Plaintiff; and, to his knowledge, has had no contact with Plaintiff. Doc. 27-1 at 1. Dunn denies violating Plaintiff's constitutional rights. *Id.*

McDonnell stated that in the summer of 2015, he met with Culliver, Conway, and Angie Baggett, the Assistant Classification Director who is not a defendant in this case, "to discuss changes to the classification manual due to a critical need for close custody cells in the ADOC system." Doc. 135-1 at 2. McDonnell states:

---

[4] Mental health care for inmates in segregation is the subject of another lawsuit, *Braggs v. Dunn*, 2:14-cv-601-MHT (M.D. Ala.). The court takes judicial notice of the proceedings in *Braggs.* Fed. R. Evid. 201.

> A number of recommendations were adopted by this group and approved by the Commissioner, Jeffery S. Dunn. The ADOC classification manual was changed accordingly. One of the changes resulted in no longer requiring close custody for inmates facing non capital offenses which could result in a LWOP sentence like the charge inmate Bracy was facing. At the time of these changes, I had no knowledge of inmate Bracy's civil action.

Doc. 135-1 at 2; *see also* Doc. 162 at 2. Culliver stated the policy regarding placement of inmates facing potential LWOP sentences was changed "because it was found to be impractical." Doc. 195-4 at 2.

Conway and McDonnell stated, "The Classification Manual is published under the authority of the ADOC Commissioner with all revisions, amendments, and additions being submitted through the Director and/or Assistant Director of Classification." Docs. 100 at 1-2, 162 at 4. Culliver stated that he, McDonnell, and Conway conferred on the changes to the classification manual; that McDonnell approved the changes; and that Commissioner Dunn gave the ultimate approval of them. Doc. 195-4 at 2-3.  Nevertheless, Culliver also stated:

> As the Associate Commissioner for Operations *I am not responsible* for promulgating rules and procedures for the Classification Division, but in my experience and position I do know why there is a rule/procedure of holding inmates in segregation who have, or could be, sentenced to death or life without the possibility of parole. Inmates are placed in segregation so that they can be *closely observed and to ensure that they can acclimate to the idea [of] being in prison for the rest of their life.* It is my understanding that the previous procedure was that they *housed in segregation for ninety (90) days and that the procedure has been changed to thirty (30) days.*

Doc. 69-3 at 2 (emphasis added). According to Dorothy Allison, Kilby Classification Specialist, "The classification guidelines do not require an annual or semi-annual progress review for LWOP inmates." Doc. 85-3 at 2. The record includes no classification review for Plaintiff while he was housed in close custody for approximately two years pursuant to § 5.2.2.4.

In answer to a later question why inmates facing LWOP were placed in close custody, Culliver responded, "[i]t is my belief the policy was put in place as a security precaution." Doc. 195-4 at 1. Culliver stated the placement was not meant to be punitive. Doc. 195-4 at 2. Culliver stated he was not aware of an ADOC official who could override Plaintiff's placement in close custody. Docs. 163-5 at 1-2, 195-4 at 2. Culliver did say that in certain cases the Associate Commissioner of Operations, which is Culliver's position, may override portions of an administrative regulation. Doc. 195-4 at 3.

Williams, the ADOC Deputy Commissioner for Governmental Relations, stated he does not control the daily operation of Kilby, and he had no involvement in the events concerning Plaintiff. Doc. 69-2.

Holt stated that she retired from the Central Records Division of the ADOC on December 31, 2012, before Plaintiff arrived at Kilby. Holt stated she does not know Plaintiff or recall having any contact with him, and she never worked in the Classification Division. Doc. 51-1. Holt stated "[a]n inmate's custody level and/or classification is the responsibility of the Classification Director of ADOC, not the Central Records Division." Doc. 51-1.

Billups, Bolling, Logan, and Richardson stated that Plaintiff was transferred to close custody pursuant to ADOC policy. Docs. 27-4 at 1, 27-5 at 1-2, 27-6 at 1, 27-7 at 1. Bolling was not working at Kilby when Plaintiff was placed in close custody. Doc. 195-3 at 1. Bolling states close custody inmates with a potential LWOP sentence had the same privileges as those in administrative segregation. Doc. 195-3 at 2. Bolling states he has no knowledge of Plaintiff not receiving the same privileges as other inmates in segregation. Doc. 195-3 at 2. Plaintiff submitted affidavits from three persons who were housed in close custody with him. Kenyaree Fuller, Willie

Locke, and Pat Norris stated they were present when the alleged violations occurred to Plaintiff. Docs. 204-1, 204-2, 204-3.

## B. Conditions in Close Custody

Plaintiff stated his cell in close custody segregation was 8 feet by 5 feet and "freezing cold" with no heat. Docs. 1 at 4, 33 at 18. He stated that at times, the water from toilets on the level above him would run down his cell walls while he was eating. Doc. 33 at 13. Plaintiff stated he found roaches in his food on more than five occasions, and in response he received another food tray. Doc. 33 at 13. Plaintiff stated his exercise was walking in circles in the exercise yard for about an hour on weekdays, shackled and cuffed behind his back, "unable to stretch his legs or arms." Docs. 33 at 8, 53 at 8. Plaintiff stated he was treated for mental health issues, gained fifty pounds, and "suffered irreparable harm to his muscles, due to lack of exercise" and solitary confinement. Docs. 33 at 18, 53 at 8. He stated the lights were on twenty-four hours a day, seven days a week, and when he moved to his new cell the officers would "turn the music on so loud that you can't concentrate." Doc. 53 at 8-9. Plaintiff stated he complained that cell blocks C and D lacked an intercom, which meant he had no way to call for help if needed. Doc. 33 at 10. The record indicates Plaintiff complained about back pain and was treated for mental health issues by persons who are not defendants. Docs. 35, 171.

The cells in C, D, E, and F Block in segregation are 8 by 5 feet, and the cells in O Dorm are 11 by 7 feet 8 inches, except for two cells, which are 13 feet 2 inches by 11 feet, and 16 feet 6 inches by 11 feet. All the cells in P Ward are 7 feet 10 inches by 5 feet, and the cells in L Block are 11 feet 7 inches by 7 feet 10 inches, except for one cell that is 7 feet 10 inches by 5 feet 7 inches. Doc. 194-3 at 1. According to Warden Thomas, Plaintiff exercised in accordance with

12

SOP, which required that "LWOP, Close Custody, Administrative Segregation and Disciplinary Segregation inmates [] be handcuffed and double locked behind their back when brought out of their cells for any reason except visitation." Doc. 139-1 at 13; *see also* Doc. 27-9 at 11-12 (SOP VI-7 provides that LWOP inmates are similarly cuffed). According to Administrative Rule ("AR") 433 on Administrative Segregation, inmates in segregation may exercise "without handcuffs, unless there is a threat to institutional safety or security." Doc. 128-1 at 7 (dated Aug. 18, 2009) (sealed).

Billups, Bolling, Logan, and Richardson stated that the segregation unit is heated in winter. They stated that inmates in segregation are given the opportunity to exercise, but they are not forced to exercise. They stated that a pest control company treats the facility at least once a month and additionally as needed. Billups, Bolling, Logan, and Richardson admitted that there is no intercom system in the segregation unit, but officers assigned to the unit monitor it and ensure inmate safety. Docs. 27-4 at 2, 27-5 at 2, 27-6 at 2, 27-7 at 2. In November 2016, Billups stated inmates in segregation receive cleaning supplies, including bleach, every other day to clean their cells. Doc. 161-1 at 1. She stated that Plaintiff did not complain to her during her weekly rounds in segregation. Doc. 161-1 at 1-2. Billups stated she did not see mold or feces on the walls, ceilings, or showers during rounds, and no one reported it to her. Doc. 161-1 at 2. Billups further states "[t]here are no cell inspection reports that show health or safety hazards including fire hazards, feces on the walls or black mold in the ceiling/showers of the Segregation Unit/Restrictive Housing Unit." Doc. 194-2 at 1.

Plaintiff asserted that infectious diseases could spread among inmates at Kilby because clippers and shavers were not disinfected properly between uses. Doc. 20-1. Billups, Bolling, Logan, and Richardson maintain that clippers and shavers are properly disinfected between uses

13

with Barbicide. Docs. 27-4, 27-5, 27-6, 27-2, 27-8.   Plaintiff's requested relief regarding the clippers is that the court "declare an injunction that will stop this unnecessary spread of disease." Doc. 20-1 at 2. The record includes no evidence that Plaintiff contracted an infectious disease during or after his stay at Kilby.

### C. Sergeant Richardson

Plaintiff asserted that while he was in close custody, inmates were engaged in homosexual sex, and Plaintiff tried to complain to Richardson that he was propositioned with sexual acts by inmates. Doc. 1 at 4.  Plaintiff stated that his complaints ended up with an inmate "runner," who, in turn, harassed Plaintiff and told everyone Plaintiff was a snitch, which placed Plaintiff's life in danger. Plaintiff also asserted that Richardson made a sexual advance toward Plaintiff. *Id.*

Billups stated in early July 2015, that she had no knowledge of Plaintiff making any complaints to or about Richardson or that Plaintiff felt his life was in danger. Doc. 27-4 at 2. Billups, Bolling, and Logan stated in early July 2015 that they have no knowledge of Plaintiff being sexually harassed by Richardson or an inmate, or of Plaintiff's complaints of homosexual acts that occurred on the cell block, or of any complaints that Plaintiff was sexually harassed. Docs. 27-4 at 2, 27-5 at 2, 27-6 at 2. Billups and Bolling stated that whenever an inmate runner enters the segregation unit, an officer is present. Docs. 27-4 at 2, 27-5 at 2.

A prison investigation about Plaintiff's claim occurred in July 2015, after Plaintiff filed suit, and the results were reported to Billups. Doc. 45-1 at 6 (sealed). During the investigation, Plaintiff said that Richardson went to Plaintiff's cell and said if Plaintiff went along with the game or the program, then Plaintiff would be out of segregation; and on another occasion Richardson put his hand on Plaintiff's shoulder and said if Plaintiff had gone along with the program, he would have been out of segregation, which Plaintiff interpreted as a sexual advance. Doc. 45-1 at 2, 19-22

14

(sealed). Richardson and other inmates disputed Plaintiff's version of the events, and the incident was ruled unsubstantiated. Doc. 45-1 (sealed). After Plaintiff reported the incident, he was moved from the segregation unit to a single cell in O Dorm. Doc. 45-1 at 6 (sealed)

## V. DISCUSSION

### A. Declaratory and Injunctive Relief

Plaintiff's requests for declaratory and injunctive relief against the defendants are due to be dismissed as moot because Plaintiff is no longer incarcerated. The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also See Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1342 n.1 (11th Cir. 2016) ("since Mr. Jacoby is no longer an inmate at the Baldwin jail, his claims for injunctive relief are moot"); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). Consequently, Plaintiff's requests for equitable relief are moot.

Plaintiff sought only injunctive relief regarding disinfection of clippers and shavers. Doc. 20-1 at 2. Thus, his claim in connection to the use of unsanitary clippers and shavers must be dismissed. The court now considers Plaintiff's remaining claims for damages related to his confinement in close custody and the conditions in close custody unrelated to his claim regarding disinfection of clippers and shavers.

### B. Suits Against Defendants in Their Official Capacities

Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity for money damages unless the state has waived its Eleventh Amendment

15

immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims seeking monetary damages from them in their official capacities. The claims for money damages brought against the defendants in their official capacities are therefore due to be dismissed.

### C. 42 U.S.C. § 1997e(e)

Defendants also assert that Plaintiff does not allege "a prior showing of physical injury," consequently he cannot obtain compensatory damages "for mental or emotional injury." *See* 42 U.S.C. § 1997e(e)[5]; Doc. 27 at 16. Section 1997e(e) is a limit on relief, consequently Plaintiff cannot obtain punitive damages and compensatory damages for simply mental or emotional injury. *See Al-Amin v. Smith*, 637 F.3d 1192, 1198 (11th Cir. 2011) (holding prior case law "forecloses the punitive damage relief sought by Al-Amin, given that his constitutional claim does not meet § 1997e(e)'s physical injury requirement"). Nevertheless, if Plaintiff can show a physical injury, § 1997e(e) does not bar relief. In addition, to the extent Plaintiff requests nominal damages,[6] they

---

[5] Section 1997e(e) provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." Plaintiff does not assert, and the record does not support, a finding that this case involves a sexual act as defined in 18 U.S.C. § 2246.

[6] Even though Plaintiff did not specifically request nominal damages on his original claims, the court has liberally construed the pro se pleadings to include a request for them. Doc. 33 at 19 (requesting "any and all, other or general relief that he may be entitled"); *see Magwood v. Sec'y, Fla. Dep't of Corr.*, 652 F. App'x 841, 845 (11th Cir. 2016) (citing *Hughes v. Lott*, 350 F.3d 1157, 1162-63 (11th Cir. 2003)); *cf. Slicker v. Johnson*, 215 F.3d 1225, 1231-32 (11th

"'are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.'" *Williams v. Brown*, 347 F. App'x 429, 436 (11th Cir. 2009) (quoting *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003)); *see also Brooks v. Warden*, 800 F.3d 1295, 1307-08 (11th Cir. 2015) (holding that nothing in § 1997e(e) prevents a prisoner from recovering nominal damages for a constitutional violation without a showing of physical injury); *Hughes*, 350 F.3d at 1162 ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.").

### D. Qualified Immunity

The defendants assert they are entitled to qualified immunity. Doc. 27 at 14-15. Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that the defendants were

---

Cir. 2000) (if nonprisoner plaintiff was unable to demonstrate that he suffered an actual injury, "under controlling case law the district court erred in not allowing [plaintiff] to seek nominal damages").

acting within the course and scope of their discretionary authority when the incidents complained of occurred. The plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that the defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided," (2) "a broader, clearly established principle that should control the novel facts of the situation," or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208-09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling case law is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Court of Appeals for the Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. If the plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze

18

the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### 1. Close Custody Segregation

It is undisputed that defendants Billups, Bolling, Logan, Richardson, Williams, and Holt were uninvolved in classifying Plaintiff or approving the policy to place inmates facing potential sentences of LWOP in close custody pending the resolution of the claims. These defendants could not prevent Plaintiff from being placed in close custody, and they could not remove him from it. Consequently, summary judgment is due to be granted to defendants Billups, Bolling, Logan, Richardson, Williams, and Holt on Plaintiff's claims concerning his detention in close custody. The Court therefore considers Plaintiff's due process claim against only defendants Dunn, Conway, Culliver, and McDonnell, who all had authority over classification matters or policy.

As Defendants point out, Doc. 27 at 13, Plaintiff does not have a right to be housed at any particular custody level or classification. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Constitution itself does not confer any right upon an inmate to any particular custody or security classification); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."). Nevertheless, in two circumstances a prisoner can be further deprived of his liberty such that due process is required:

> The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

*Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472,

484 (1995) (other citations omitted). It is the second circumstance that is at issue in Plaintiff's case.

This court must therefore determine whether the actions about which Plaintiff complains involved

the deprivation of a state-created liberty interest as defined by the standard set forth in *Sandin*.

"After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected,

state-created liberty interest in avoiding restrictive conditions of confinement is not the language

of regulations regarding those conditions but the nature of those conditions themselves 'in relation

to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005) (quoting

*Sandin*, 515 U.S. at 484). In *Wilkinson*, the Court considered whether an inmate received sufficient

due process before being placed in Ohio's highest security prison, OSP. *Wilkinson*, 545 U.S. at

213. The Court held the conditions were atypical and significant and thus gave rise to a liberty

interest that could not be taken away without appropriate due process:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

> OSP's harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners. That necessity, however, does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance.

*Wilkinson*, 545 U.S. at 223-24 (citations omitted).

The decision in *Wilkinson* undercuts Defendants' arguments that Plaintiff had no liberty interest at stake. When Plaintiff asserted that prisoners serving LWOP could receive more privileges than Plaintiff received while in close custody, Defendants' response was that Plaintiff received what close custody inmates received. Doc. 139-1. But Defendants' response did not address that Plaintiff was kept there for two years, that conditions for other forms of segregation were not as onerous, that not all LWOP prisoners were in close custody, and that Plaintiff was not serving LWOP but rather faced potential LWOP. *See Delgiudice v. Primus*, 679 F. App'x 944, 948 (11th Cir. 2017) (under *Sandin*, "when disciplinary segregation or solitary confinement basically mirrors the conditions imposed upon inmates in administrative segregation and protective custody, it does not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest"), *cert. denied*, 138 S. Ct. 100 (2017). Under § 5.2.2.4 before it was amended in 2015, even some inmates facing potential LWOP were not required to be in close custody. Based on *Wilkinson* a reasonable jury could determine that Plaintiff's placement in the prison's most restrictive administrative segregation, that was similar to the segregation in *Wilkinson*, indefinitely, and ultimately for two years, without review, constituted an atypical and significant deprivation in relation to the ordinary incidents of prison life and therefore gave rise to a state-created liberty interest. *Wilkinson*, 545 U.S. at 224. Along with this genuine dispute of material fact, another question remains, namely, if Plaintiff had a liberty interest at stake, then what procedural protections were due to Plaintiff? Defendants do not address whether the procedures afforded to Plaintiff complied with due process requirements. They simply say none were required. Docs. 27 at 13, 139-1 at 9-10.

Defendants maintain they are entitled to qualified immunity on the due process question. The court disagrees. The conditions in *Wilkinson* were strikingly similar to those Plaintiff

experienced. For example, both Plaintiff and the inmate in *Wilkinson* were locked in their cells for 23 hours a day, the lights were on all the time, meals were eaten alone in the cell, they were isolated from most human contact, and the placement was indefinite. *Wilkinson*, 545 U.S. at 214, 224. In some respects, Plaintiff's deprivations were even more harsh than those in *Wilkinson.* Plaintiff's cell was 8 by 5 feet, while the cell in *Wilkinson* was 7 by 14 feet, and the inmate in *Wilkinson* received annual reviews, while Plaintiff received none. *Id.* The principles in *Wilkinson*, decided in 2005, were well established when Plaintiff was placed in close custody in 2013 and remained there until 2015. A reasonable prison official would have known that a similar deprivation could give rise to a protected liberty interest. *See Hope*, 536 U.S. at 739 (discussing qualified immunity standard). Defendants suggest Plaintiff's case is like that in *Morefield v. Smith*, 404 F. App'x 443, 446 (11th Cir. 2010), where an inmate was kept for four years in administrative segregation. But the administrative segregation conditions in *Morefield* "were generally equivalent to general prison population conditions" and periodically reviewed--unlike the most restrictive, indefinite, and unreviewed conditions Plaintiff experienced. Consequently, Defendants Dunn, Conway, Culliver, and McDonnell are not entitled to qualified immunity on Plaintiff's due process claim.

Plaintiff maintains that he was treated differently than even other inmates serving LWOP and death row inmates. Docs. 1 at 3, 33 at 6. Defendants respond that Plaintiff does not state an equal protection claim because he was not similarly situated to general population inmates. Doc. 139-1 at 9-10. The Equal Protection Clause of the Fourteenth Amendment generally requires states to treat all similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Where someone is not part of an otherwise unidentifiable group receiving added protections, that person can bring an equal protection claim as a "class of one," and the court considers whether the state action is rationally related to a legitimate government

purpose. *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). To state a claim of equal protection as a "class of one," a plaintiff must allege that (1) he is similarly situated to (2) "comparators [who are] prima facie identical in all relevant respects," and that (3) defendants have intentionally treated him differently, (4) without any rational basis. *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). To be similarly situated, the comparators must be prima facie identical in all relevant respects. *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010). The Court of Appeals has stated that "establishing a 'class of one' equal protection claim can be an onerous task . . ." *Leib*, 558 F.3d at 1307. This court concludes, however, that genuine issues of material fact remain regarding Plaintiff's equal protection claim, including whether there was a rational basis for treating inmates potentially facing LWOP more harshly than inmates actually serving LWOP, and for treating inmates facing LWOP on retrial differently than those facing LWOP who had not been tried. Culliver said inmates facing LWOP were placed in close custody as a security precaution, but he also said it was to acclimate the inmates to LWOP, even though the classification manual contemplated placing inmates serving LWOP in medium custody. Docs. 17-3 at 5-6, 69-3 at 2, 195-4 at 1. Furthermore, the record includes inconsistent statements from prison officials on whether LWOP prisoners were reviewed after placement in close custody—Allison said they received no annual or semi-annual review, and Culliver thought review was supposed to occur every ninety days and that the procedure was changed to thirty days. Docs. 69-3 at 2, 85-3 at 2. The rational basis standard for Plaintiff's equal protection claim was well established when he was placed and kept in close custody. Defendants Dunn, Conway, Culliver, and McDonnell are therefore not entitled to qualified immunity on Plaintiff's equal protection claim. *See Gaines*, 871 F.3d at 1208-09 (clearly established law includes "a broader, clearly established principle that should control the novel facts

of the situation"). Summary judgment on Plaintiff's claims against Defendants Dunn, Conway, Culliver, and McDonnell in their individual capacities for damages related to Plaintiff's detention in close custody is therefore due to be denied.

### 2. Eighth Amendment

Plaintiff claims that the conditions of his confinement in close custody were inhumane,[7] and he claims that Richardson sexually harassed him and failed to protect him. Based on the summary judgment record before the court, Defendants are entitled to summary judgment on these claims.

The Eighth Amendment protects convicted prisoners from the "unnecessary and wanton infliction of pain" that is "totally without penological justification." *Hope*, 536 U.S. at 737 (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)) (quotation marks omitted). An Eighth Amendment claim includes an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To show the objective component, "the deprivation alleged must be, objectively, sufficiently serious." *Id.* Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes*, 452 U.S. at 347. "The Constitution does not mandate comfortable prisons," but it imposes restraints on prison officials, for example, not to use excessive force against prisoners, and it requires that prison officials "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates[.]" *Farmer*, 511 U.S. at 832 (quotation marks and citations

---

[7] Plaintiff also later asserted that he was denied his right to exercise his freedom of religion. Doc. 33 at 14. The court does not construe the comment as a motion to amend the complaint. *See* Fed. R. Civ. P. 15 (governing amended pleadings).

omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834.

On the subjective component, the "state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (citation omitted). Deliberate indifference means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 837-38; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("proof that the defendant should have perceived the risk, but did not, is insufficient"). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Wilson v. Seiter*, 501 U.S. 294, 305 (1991) ("mere negligence" does not constitute deliberate indifference).

Here, no reasonable juror could find in Plaintiff's favor on his claimed Eighth Amendment violation against Richardson or the other Defendants. "[S]exual abuse of a prisoner by a

corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) (quotation marks and citation omitted). "However, under our circuit precedent about the nature of actionable injuries under the Eighth Amendment, an injury can be 'objectively, sufficiently serious' only if there is more than de minimis injury." *See id.* Here, Richardson's acts, which according to Plaintiff, consisted of putting his hands on Plaintiff's shoulders once and telling him twice he should have gone along with the program, were no more than de minimis injury under prevailing case law. *See id.* ("We conclude that a female prison guard's solicitation of a male prisoner's manual masturbation, even under the threat of reprisal, does not present more than *de minimis* injury."). There is also no genuine dispute on this record whether Richards failed to keep Plaintiff safe from a substantial risk of harm from other inmates. Summary judgment is therefore due to be granted on Plaintiff's Eighth Amendment claim against Richardson.[8] *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) ("merely negligent failure to protect an inmate from attack does not justify liability under section 1983") (quotation marks and citation omitted).

Plaintiff also claims the conditions of his confinement in close custody, including plumbing problems, feces on the walls, inadequate pest control, inadequate heat, shackles during exercise, and no intercom system, were unsanitary, painful, and dangerous. Defendants state they were unaware of any complaints from Plaintiff. They state the unit is treated for pests regularly, and additionally it is treated when complaints are made. In evaluating an Eighth Amendment claim,

---

[8] Plaintiff also suggested in his filings that Richardson retaliated against Plaintiff. Doc. 1 at 4. Apart from Plaintiff's conclusory statement, the record does not create a genuine dispute whether Richardson retaliated against Plaintiff for the exercise of a constitutional right. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) ("unsubstantiated assertions alone are not enough to withstand a motion for summary judgment"); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).

the court must consider both the severity and the duration of a prisoner's exposure to a condition. *See Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) (considering an inmate's exposure to extreme temperatures). Plaintiff does not dispute that the unit was heated, and Plaintiff provides no evidence regarding the temperature in his cell. Plaintiff also does not dispute that inmates received cleaning supplies. Plaintiff admits that he had the opportunity to exercise. The conditions, while uncomfortable, were not so extreme as to violate the Constitution. *See Farmer*, 511 U.S. at 832. Even assuming Plaintiff was forced to exercise in restraints and complained of pain to the health services staff, he does not provide any evidence that these Defendants knew it hurt Plaintiff to exercise. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for condemnation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 837-38. The record regarding the conditions in close custody at Kilby does not create a genuine issue that the conditions denied Plaintiff the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Rhodes*, 452 U.S. at 347. Furthermore, it is undisputed that none of the named Defendants were told of the alleged unsanitary conditions or otherwise had knowledge of them. The record is devoid of evidence showing the named Defendants were aware of the unsanitary and unsafe conditions and that they recklessly or deliberately disregarded them. Consequently, summary judgment is due to be granted on Plaintiff's claims concerning the conditions while he was in close custody at Kilby. *See Farmer*, 511 U.S. at 838; *cf. Brooks v. Warden*, 800 F.3d 1295, 1305 (11th Cir. 2015) (discussing circumstances that deny adequate sanitation and hygiene requirements for inmates).

### E. Respondeat Superior

Defendants argue they cannot be held liable under § 1983 for a constitutional violation by their subordinates via a theory of respondeat superior or on the basis of vicarious liability. *Ashcroft*

27

*v. Iqbal*, 556 U.S. 662, 676 (2009) (doctrine of respondeat superior is inapplicable to § 1983 actions); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability); *see also Cottone*, 326 F.3d at 1360; *Kilgo v. Ricks*, 983 F.2d 189, 194 (11th Cir. 1993) (holding the prison commissioner's dismissal was proper because no personal involvement or policy by the department was alleged). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for actions of correctional officials could attach to the supervisory defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. To establish the requisite causal connection and avoid entry of summary judgment in favor of these supervisory defendants, Plaintiff must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the supervisory defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so . . ." or "a . . . custom or policy [that] result[ed] in [violation of his] constitutional rights, or . . . facts [that] support an inference that [the supervisory defendants] directed the [supervised defendants] to act unlawfully, or knew that [they] would act unlawfully and failed to stop them from doing so." *Id.* (internal punctuation and citations omitted).

Even if Defendants Dunn, Conway, Culliver, and McDonnell were not personally involved in the decisions to place and keep Plaintiff in close custody, they were responsible for the policy that caused his continued detention in close custody. Consequently, they cannot rely on the rules proscribing liability based on respondeat superior. *See id.* ("the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to

28

constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so") (quotation marks and citations omitted).

As for the remaining Defendants, Billups, Bolling, Logan, Holt, Williams, and Richardson, they were not responsible for the closed custody policy, or the court has already determined they are due to be granted summary judgment based on their lack of personal involvement regarding Plaintiff's Eighth Amendment claim. A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Plaintiff has not met his burden to show Billups, Bolling, Logan, Holt, Williams, and Richardson directed correctional officials to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Plaintiff presents no evidence of obvious, flagrant or rampant abuse of a continuing duration in the face of which these six defendants failed to take corrective action. Based on the foregoing, summary judgment is due to be granted in favor of Defendants Billups, Bolling, Logan, Holt, Richardson, and Williams on Plaintiff's claims for relief based on respondeat superior.

## VII. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' motion to dismiss under 42 U.S.C. § 1997e(a) be DENIED.

2. Defendants' motion for summary judgment be DENIED on Plaintiff's claims for damages related to his detention in close custody against Defendants Dunn, Conway, Culliver, and McDonnell in their individual capacities.

3. Defendants' motion for summary judgment be GRANTED on Plaintiff's remaining claims, including all of his claims against Defendants Billups, Bolling, Holt, Logan, Richardson, and Williams.

It is further

ORDERED that on or before February 15, 2018, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 1st day of February, 2018.


/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE