IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHARLES WILLIAM BRACY, JR., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CASE NO. 2:15-CV-234-WKW [WO] |
| JEFFERSON S. DUNN, CASSANDRA CONWAY, KATHY HOLT, PHYLLIS BILLUPS, WARDEN BOLLING, CAPTAIN LOGAN, SGT. RICHARDSON, GRANT CULLIVER, JEFF WILLIAMS, and TERRY MCDONNELL, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles William Bracy, Jr., a former inmate of the Alabama Department of Corrections ("ADOC"), brings this action pursuant to 42 U.S.C. § 1983 to challenge his placement in segregation and the conditions of his confinement while he was an inmate at Kilby Correctional Facility. Before the court is the Recommendation of the Magistrate Judge. (Doc. # 209.) Although there were no timely objections made to the Recommendation, based on an independent review of the record, the Recommendation is due to be adopted in part

and rejected in part. Specifically, the court will reject the Magistrate Judge's recommendation on summary judgment to deny Defendants Dunn, Conway, Culliver, and McDonnell qualified immunity, and it is that issue alone that merits further discussion.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

A district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 18 U.S.C. § 636(b)(1). The court reviews the Recommendation using the same summary judgment standard applied by the Magistrate Judge. (*See* Doc. # 209, at 4–6.) Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. BACKGROUND

At the time Mr. Bracy was an inmate,[1] ADOC's classification manual provided that "[i]nmates being held on a detainer warrant for a capital offense or an offense which is likely to result in [life without parole] will be held in Close

---

[1] Mr. Bracy was released from custody during the course of this lawsuit.

custody until the resolution of the offense. . . . Placement into Close custody under these circumstances is a matter of internal security and does not imply any presumption of guilt." (Doc. # 27-3, at 5.) Close custody was the most restrictive custody level to which an inmate could be assigned, and placement there required specific approval by the Central Review Board. (Doc. # 27-3, at 6.) Other inmates eligible or mandated for Close custody included those with three or more documented incidents of assault with a weapon in the past year (mandated 24 months in Close custody); an assault that resulted in death (mandated 30 months in Close custody); an escape from a secure facility (eligible for up to 24 months in Close custody); and an escape with hostages or an escape that resulted in serious personal injury (mandated 24 months in Close custody). (Doc. # 27-3, at 5–6.) In contrast to inmates facing the *possibility* of life without parole ("LWOP"), inmates already *sentenced* to LWOP would "be observed in Close custody for a least a thirty (30) day period," but then could be classified at a less restrictive level. (Doc. # 27-3, at 6.)

On September 17, 2013, Mr. Bracy was notified that the classification team would meet the next day to recommend that he be placed in Close custody due to a pending drug trafficking charge that could result in an LWOP sentence. (Doc. # 27-3, at 3.) Mr. Bracy attended the meeting and had a chance to speak; he expressed his desire to have a lawyer present. (Doc. # 27-3, at 4.) The

3

classification team recommended that Mr. Bracy be placed in Close custody, and that recommendation was approved by a Central Review Board analyst on October 4, 2013. (Doc. # 27-3, at 7–8.)

Mr. Bracy remained in Close custody for roughly two years. On August 17, 2015, ADOC's classification manual was amended to allow inmates facing potential LWOP sentences to be placed in medium custody. Mr. Bracy was approved for this downgrade on September 2, 2015, and was transferred to a different facility on October 7, 2015. He has since been released from ADOC custody.

Mr. Bracy alleges that ADOC violated his Fourteenth Amendment rights to due process and equal protection by placing him in Close custody for two years. He claims that he suffered psychological harm from the two years spent in a cell that measured 8 feet by 5 feet, where the lights were on 24/7, where he could only eat either sitting on his toilet or on his bed, and where he was forced to spend roughly 23 hours of each day. Further, he alleges that his visitation and phone call allowances were drastically limited; that his exercise time was reduced to being allowed outside for 45 minutes per day, weather and security permitting, while his hands were cuffed behind his back and his feet were shackled; and that he was prohibited from attending religious services, self-help programs, and educational programs offered by the prison. He asserts that these limitations of Close custody

were not imposed on inmates actually serving LWOP sentences, but that ADOC treated him differently because he was facing the possibility of an LWOP sentence. (Doc. # 61, at 2–6.)

The Magistrate Judge compared Mr. Bracy's due process allegations to those in *Wilkinson v. Austin*, 545 U.S. 209 (2005), and concluded that the factual similarities were such that "a reasonable prison official would have known that a similar deprivation could give rise to a protected liberty interest." (Doc. # 209, at 22.) Accordingly, the Magistrate Judge recommended denying qualified immunity for the defendants responsible for promulgating the standards that landed Mr. Bracy in Close custody: Jefferson Dunn, the Commissioner of ADOC; Cassandra Conway, ADOC's Director of Classification; Grant Culliver, the Associate Commissioner for Operations for ADOC; and Terrance McDonnell, the Associate Commissioner of Plans and Programs who oversaw the Classification Division.

The Magistrate Judge also concluded that Mr. Bracy's equal protection claim should go forward because questions remained about "whether there was a rational basis for treating inmates potentially facing LWOP more harshly than inmates actually serving LWOP," and whether there was a rational basis "for treating inmates facing LWOP on retrial differently than those facing LWOP who had not been tried." (Doc. # 209, at 23.) Because the rational basis standard was well established when Mr. Bracy was placed in Close custody, the Magistrate

5

Judge likewise recommended denying qualified immunity for Defendants Dunn, Conway, Culliver, and McDonnell on Mr. Bracy's equal protection claim. (Doc. # 209, at 23 (citation omitted).)

## IV. DISCUSSION

A state official is entitled to qualified immunity if he was acting within the scope of his discretionary authority unless a plaintiff can demonstrate (1) that the official violated his constitutional rights and (2) that those rights were clearly established at the time of the violation. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). There is no dispute that Defendants Dunn, Conway, Culliver, and McDonnell—collectively referred to as "Defendants" in this section—were acting within the scope of their discretionary authority when they promulgated or enforced ADOC's classification manual. And, for purposes of this analysis, the court will assume that Defendants violated Mr. Bracy's constitutional rights. *See Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (courts can analyze the qualified immunity elements in any order). The issue is whether those rights were clearly established at the time of the alleged violation.

There are three ways a plaintiff can show that a constitutional right is clearly established. First, a plaintiff can point to a materially similar case that has already been decided. *Gaines*, 871 F.3d at 1208. Second, he or she can invoke a "broader, clearly established principle that should control the novel facts of the situation."

6

*Id.* And third, "the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary." *Id.* The second and third methods are known as "obvious clarity" cases, and they are rare. *See id.* at 1209.

**A. <u>Due Process Claim</u>**

The Magistrate Judge relied on the first method to analyze Mr. Bracy's due process claim. When considering cases that may be materially similar, the court "look[s] only to binding precedent—holdings of cases drawn from the United States Supreme Court, [the Eleventh Circuit], or the highest court of the state where the events took place." *Gilmore v. Hodges*, 738 F.3d 266, 277 (11th Cir. 2013). While a case need not be "directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1145 (11th Cir. 2017) (second alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In *Wilkinson v. Austin*, the case the Magistrate Judge invoked as factually similar, the Supreme Court considered a challenge to Ohio's classification system for placement of prisoners into its "Supermax" prison facility. *See* 545 U.S. at 213. Conditions at that facility were similar to those experienced by Mr. Bracy: Inmates were placed in isolation in cells that measured 7 feet by 14 feet and in which the lights were always on; inmates remained in their cells for 23 hours per day; and inmates were allowed only an hour of exercise each day in an indoor

7

recreation cell. *Id.* at 214. The Supreme Court concluded that inmates had a state-created liberty interest in avoiding placement in the Supermax facility because assignment there "impose[d] atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life." *Id.* at 223 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Key to the Court's analysis was that placement at the Supermax facility was for an indefinite period of time, was reviewed just annually (after an initial 30-day review), and resulted in the disqualification of an inmate's eligibility for parole consideration. *Id.* at 224.

The Magistrate Judge relied on *Wilkinson* to conclude that "[a] reasonable prison official would have known that a similar deprivation could give rise to a protected liberty interest." (Doc. # 209, at 22.) The Magistrate Judge then recommended that Defendants be denied qualified immunity because Mr. Bracy alleged such a deprivation. (Doc. # 209, at 22.)

The problem with this analysis is that simply because a liberty interest has arisen, or even been abridged, does not mean that a constitutional violation has occurred. It reveals only that some degree of due process is required. *See* U.S. Const. amend. XIV, § 1 ("[N]or shall any state deprive any person of life, liberty, or property, without due process of law . . . ."). For that analysis, the Supreme Court requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through

> the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Thus, in *Wilkinson*, having concluded that an inmate had a liberty interest to avoid placement at a Supermax facility, the Supreme Court applied the *Mathews* factors to Ohio's classification procedures. *Wilkinson*, 545 U.S. at 225. Under those procedures, Ohio considered an inmate for Supermax placement if he was convicted of certain offenses or if he engaged in specified conduct while in prison. *Id.* at 216. To begin the review process, a prison official prepared a form detailing why the inmate might be considered for Supermax. The inmate was then given 48 hours' notice that a three-member classification committee would meet to consider the placement recommendation. The inmate could attend the hearing and offer any pertinent information or objections to the potential placement. If the classification committee recommended placement in a Supermax facility, the committee would create a classification report that detailed the reasons for the placement determination and listed any objections made at the hearing. *Id.* at 216–17. That report would then be reviewed by the warden of the prison or another designated prison official. If that official agreed with the classification assessment, the report would be forwarded, with the reviewing official's comments, to the Bureau of

Classification for a final determination. At that point, the inmate would have 15 days to make any objections to the placement recommendation, at which time the Bureau would review all the prior recommendations and make a final determination of placement. *Id.* at 217. If all levels of review agreed with the placement decision, the inmate would then be transferred to a Supermax facility. Once there, the inmate would receive one more placement review within 30 days of arrival. If the inmate was deemed properly placed, he would then receive only annual reviews. *Id.*

In determining that these procedures provided inmates with sufficient due process, the Supreme Court first emphasized that the private liberty interest affected, "while more than minimal," must nevertheless be evaluated within the context of the prison system. *Id.* at 225. As for the second *Mathews* factor, the Court explained that Ohio's policy "provides that an inmate must receive notice of the factual basis leading to consideration for [Supermax] placement and a fair opportunity for rebuttal," and that inmates could also submit objections prior to the final level of review. *Id.* at 225–26. "In addition to these safeguards, Ohio further reduces the risk of erroneous placement by providing for a placement review within 30 days of an inmate's initial assignment to [Supermax]." *Id.* at 227. Finally, the Court found that the third *Mathews* factor—the state interest involved—was a "dominant consideration" because the state's "first obligation

must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Id.* The Court concluded: "A balance of the *Mathews* factors yields the conclusion that Ohio's [placement policy] is adequate to safeguard an inmate's liberty interest in not being assigned to [Supermax]." *Id.*

Turning to Mr. Bracy's claim, and assuming that Mr. Bracy had a liberty interest in avoiding Close custody, the question remains whether it was clearly established at the time that the classification system did not afford Mr. Bracy due process. The Magistrate Judge notes that "Defendants do not address whether the procedures afforded to Plaintiff complied with due process requirements . . . [and] simply say none were required." (Doc. # 209, at 21 (citing Docs. # 27, at 13, and 139-1, at 9–10).) But since the burden is on Mr. Bracy to show that his constitutional right was clearly established, it does not matter whether Defendants now defend ADOC's classification system as sufficient. What matters is whether a reasonable official, in the light of preexisting law, would understand at the time that the classification system violated Mr. Bracy's due process rights. *Mikko*, 857 F.3d at 1146. In other words, "[t]he salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Id.* (quoting *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015)).

11

The record shows that Mr. Bracy was put on 24-hours' notice that the classification team was meeting to consider his placement in Close custody. (Doc. # 27-3, at 3.) Mr. Bracy attended that meeting and was able to make objections. A record of the hearing was made. The classification team, which consisted of a classification specialist, a psychologist, a prison warden or representative, a classification coordinator, and a member or analyst from the Central Review Board, then determined that Mr. Bracy fit the criteria for Close custody placement. (Doc. # 27-3, at 7.) That classification determination was then approved by the Central Review Board. (Doc. # 27-3, at 8.) It is unclear if Mr. Bracy received any further review. (*See* Doc. # 209, at 23 (noting inconsistency in statements from prison officials as to how often inmates received classification review once placed in Close custody).)

While the process afforded Mr. Bracy certainly falls below that approved by the Supreme Court in *Wilkinson*, it does not follow that Alabama's process was thereby constitutionally deficient—much less that it was clearly established to be so. The holding of *Wilkinson* was that Ohio's classification process passed constitutional muster. 545 U.S. at 228. The holding was not that anything short of that process did not. It remains an open question whether the Court's determination would be the same if Ohio offered one less level of review, or if it provided 24-hour notice instead of 48-hour notice, or if it did not provide for

annual review once a classification determination was made, or if any of a number of variables had been altered. At the very least, Mr. Bracy has not offered a binding decision in which a classification process similar to the one used by ADOC has been held unconstitutional. Accordingly, Defendants are entitled to qualified immunity on Mr. Bracy's due process challenge.

B. **Equal Protection Claim**

As for Mr. Bracy's equal protection claim, the Magistrate Judge relied on the second way a plaintiff can defeat qualified immunity: a "broader, clearly established principle that should control the novel facts of the situation." (Doc. # 209, at 23–24 (quoting *Gaines*, 871 F.3d at 1208).) Cases that defeat qualified immunity by this method are "exceptional" and "rarely arise." *Santamorena v. Ga. Military Coll.*, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998). They occur only when case law is so clear and broad that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). Moreover, simply because there is a broad principle of law on point does not necessarily mean the rule applies. Instead, it is only when a court has expressly held that "'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts [that] the decision on 'X Conduct' can be read as having clearly established a

constitutional principle." *Id.* Most broad principles of law remain insufficient to give fair notice or warning. *Id.* at 1351 n.21 (citing *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (broad principle that "the use of excessive force by a law enforcement officer is a constitutional violation" is insufficient to clearly establish the law)).

The broad principle on which the Magistrate Judge relied is that a state may not treat a "class of one" plaintiff differently from comparators "without any rational basis." (Doc. # 209, at 23 (citing *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006).) The Magistrate Judge concluded that the rational basis standard was well established when ADOC treated Mr. Bracy differently than inmates already sentenced to LWOP, and the violation of this standard was enough to defeat Defendants' assertion of qualified immunity. (Doc. # 209, at 23.)

This was error. The Eleventh Circuit has confronted the issue of whether a "class of one" claim can proceed under the "broad legal principle" category, and it decided that it could not. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007). The court explained that though the legal principle "that the Fourteenth Amendment forbids the denial of equal protection even when the plaintiff is only a 'class of one'[] is certainly broad," *id.*, it does not fit the definition of a precedent that is "hard to distinguish from later cases because so few facts are material to the broad legal principle," *id.* (quoting *Vinyard*, 311 F.3d

at 1351). Instead, "the precise facts of a case are critical in evaluating a 'class of one' claim." *Id.*

That is the situation here. Defendants have offered various reasons for treating inmates facing LWOP differently than other inmates, including inmates already sentenced to LWOP. (*See* Docs. # 17-3, at 5–6; 69-3, at 2; and 195-4, at 1.) Determining whether those reasons are rational is a fact-bound inquiry. The facts in dispute are material to the application of the broad legal principle invoked by the Magistrate Judge. It follows that the "broad legal principle" category cannot be used to deny Defendants qualified immunity.

## V. CONCLUSION

Accordingly, it is ORDERED as follows:

1. The Recommendation of the Magistrate Judge (Doc. # 209) is ADOPTED in part and REJECTED in part;

2. Defendants' motions to dismiss under 42 U.S.C. § 1997e(a) are DENIED;

3. Defendants' motions for summary judgment are GRANTED on all of Plaintiff's claims;

4. A final judgment will be entered separately

DONE this 21st day of March, 2018.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE